1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHEILA LAMBERT,<br><br>          Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>          Defendant. | 1:09-cv-00186-SMS<br><br>DECISION AND ORDER DENYING<br>PLAINTIFF'S SOCIAL SECURITY<br>COMPLAINT (DOC. 1)<br><br>ORDER DIRECTING THE ENTRY OF<br>JUDGMENT FOR DEFENDANT MICHAEL J.<br>ASTRUE, COMMISSIONER OF SOCIAL<br>SECURITY, AND AGAINST PLAINTIFF<br>SHEILA LAMBERT |

Plaintiff is proceeding with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application of March 23, 2004, made pursuant to Titles II and XVI of the Social Security Act, for disability insurance benefits (DIB) and supplemental security income (SSI), in which she alleged that she had been disabled since November 10, 2002, due to degenerative disc disease and carpal tunnel syndrome with associated back and leg pain, weakness and numbness in the legs, inability to stand more than thirty minutes at a time, inability to sit or lie for prolonged periods, and need to use a cane to walk. (A.R. 189-92, 661-64, 208.) The parties have consented to the jurisdiction of

the United States Magistrate Judge pursuant to 28 U.S.C. §
636(c)(1), manifesting their consent in writings signed by the
parties' authorized representatives and filed on behalf of
Plaintiff on January 29, 2009, and on behalf of Defendant on
March 2, 2009. Thus, the matter is assigned to the Magistrate
Judge to conduct all further proceedings in this case, including
entry of final judgment.

The decision under review is that of Social Security
Administration (SSA) Administrative Law Judge (ALJ) Patricia
Leary Flierl, dated September 4, 2008 (A.R. 16-24)[1], and rendered
after a hearing held on June 27, 2008, at which Plaintiff
appeared and testified with the assistance of an attorney (A.R.
16, 64-97). Plaintiff's husband and a vocational expert also
testified. (A.R. 16.)

The Appeals Council denied Plaintiff's request for review of
the ALJ's 2008 decision on December 18, 2008 (A.R. 8-10), and
thereafter Plaintiff filed the complaint in this Court on January
29, 2009. Appellant's opening brief was filed on August 6, 2009,
and Defendant's motion for summary judgment was filed on August
31, 2009. Plaintiff's reply was timely filed on September 22,
2009, after the refiling of Defendant's responsive brief. The
matter has been submitted without oral argument to the Magistrate
Judge.

---

[1] The ALJ had previously held a hearing and issued a decision dated
February 21, 2007, on Plaintiff's applications. (A.R. 114-25.) On October 13,
2007, the Appeals Council granted Plaintiff's request for review of the ALJ's
decision, vacated the decision, and remanded the case to an ALJ to obtain
further evidence and to consider and resolve issues concerning, and make
appropriate findings regarding, the opinion of Plaintiff's treating physician,
Dinesh Sharma, M.D., regarding Plaintiff's residual functional capacity, and
the weighing of the testimony of Plaintiff's husband. (A.R. 127-28.)

1        I. <u>Jurisdiction</u>

2        This Court has subject matter jurisdiction pursuant to 42

3   U.S.C. §§ 1383(c)(3) and 405(g), which provide that an applicant

4   suffering an adverse final determination of the Commissioner of

5   Social Security with respect to disability or SSI benefits after

6   a hearing may obtain judicial review by initiating a civil action

7   in the district court within sixty days of the mailing of the

8   notice of decision. Plaintiff timely filed her complaint on

9   January 29, 2009, less than sixty days after the mailing of

10  denial of review by the Appeals Council on December 18, 2008.

11       II. <u>Standard and Scope of Review</u>

12       Congress has provided a limited scope of judicial review of

13  the Commissioner's decision to deny benefits under the Act. In

14  reviewing findings of fact with respect to such determinations,

15  the Court must determine whether the decision of the Commissioner

16  is supported by substantial evidence. 42 U.S.C. § 405(g).

17  Substantial evidence means "more than a mere scintilla,"

18  <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971), but less than a

19  preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10

20  (9th Cir. 1975). It is "such relevant evidence as a reasonable

21  mind might accept as adequate to support a conclusion."

22  <u>Richardson</u>, 402 U.S. at 401. The Court must consider the record

23  as a whole, weighing both the evidence that supports and the

24  evidence that detracts from the Commissioner's conclusion; it may

25  not simply isolate a portion of evidence that supports the

26  decision. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir.

27  2006); <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985).

28  It is immaterial that the evidence would support a finding

1   contrary to that reached by the Commissioner; the determination

2   of the Commissioner as to a factual matter will stand if

3   supported by substantial evidence because it is the

4   Commissioner's job, and not the Court's, to resolve conflicts in

5   the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th

6   Cir. 1975).

7       In weighing the evidence and making findings, the

8   Commissioner must apply the proper legal standards. <u>Burkhart v.</u>

9   <u>Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must

10  review the whole record and uphold the Commissioner's

11  determination that the claimant is not disabled if the

12  Commissioner applied the proper legal standards, and if the

13  Commissioner's findings are supported by substantial evidence.

14  <u>See,</u> <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d

15  509, 510 (9th Cir. 1987); <u>Jones v. Heckler</u>, 760 F.2d at 995. If

16  the Court concludes that the ALJ did not use the proper legal

17  standard, the matter will be remanded to permit application of

18  the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th

19  Cir. 1987).

20      III. <u>Disability</u>

21          A. <u>Legal Standards</u>

22      In order to qualify for benefits, a claimant must establish

23  that she is unable to engage in substantial gainful activity due

24  to a medically determinable physical or mental impairment which

25  has lasted or can be expected to last for a continuous period of

26  not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).

27  A claimant must demonstrate a physical or mental impairment of

28  such severity that the claimant is not only unable to do the

1  claimant's previous work, but cannot, considering age, education,
2  and work experience, engage in any other kind of substantial
3  gainful work which exists in the national economy. 42 U.S.C.
4  1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th
5  Cir. 1989). The burden of establishing a disability is initially
6  on the claimant, who must prove that the claimant is unable to
7  return to his or her former type of work; the burden then shifts
8  to the Commissioner to identify other jobs that the claimant is
9  capable of performing considering the claimant's residual
10 functional capacity, as well as her age, education and last
11 fifteen years of work experience. Terry v. Sullivan, 903 F.2d
12 1273, 1275 (9th Cir. 1990).

13      The regulations provide that the ALJ must make specific
14 sequential determinations in the process of evaluating a
15 disability: 1) whether the applicant engaged in substantial
16 gainful activity since the alleged date of the onset of the
17 impairment, 20 C.F.R. § 404.1520;[2] 2) whether solely on the basis
18 of the medical evidence the claimed impairment is severe, that
19 is, of a magnitude sufficient to limit significantly the
20 individual's physical or mental ability to do basic work
21 activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the
22 basis of medical evidence the impairment equals or exceeds in
23 severity certain impairments described in Appendix I of the
24 regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant
25 has sufficient residual functional capacity, defined as what an
26 individual can still do despite limitations, to perform the

27 _____

28      [2] All references are to the 2008 version of the Code of Federal
   Regulations unless otherwise noted.

1  applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and
2  5) whether on the basis of the applicant's age, education, work
3  experience, and residual functional capacity, the applicant can
4  perform any other gainful and substantial work within the
5  economy, 20 C.F.R. § 404.1520(f).

6      With respect to SSI, the five-step evaluation process is
7  essentially the same. <u>See</u> 20 C.F.R. § 416.920.

8          B. <u>The ALJ's Findings</u>

9      The ALJ found that Plaintiff met the insured status
10  requirements of the Act through December 31, 2007, but not
11  thereafter. Plaintiff had severe impairments of borderline carpal
12  tunnel syndrome, degenerative disc disease of the cervical spine,
13  and mild degenerative disc disease of the lumbar spine most
14  prominent at L4/5 and L5/S1, but Plaintiff had no impairment or
15  combination thereof that met or medically equaled a listed
16  impairment. (A.R. 19.) Plaintiff retained the residual functional
17  capacity (RFC) to lift and carry ten pounds occasionally, stand
18  and/or walk two hours, stoop occasionally, with no kneeling,
19  crouching, crawling, pushing, pulling, reaching at or above
20  shoulder level, or exposure to pulmonary irritants. (A.R. 19.)
21  Plaintiff could not perform her past relevant work, but
22  Plaintiff, who was thirty-eight years old on the alleged date of
23  onset of disability, could perform other jobs that existed in
24  significant numbers in the national economy, such as ticket
25  counter, order clerk, and receptionist. (A.R. 22-23.)
26  Accordingly, Plaintiff was not disabled at any time from November
27  10, 2002, through September 4, 2008, the date of decision. (A.R.
28  23-24.)

1       C. <u>Plaintiff's Contentions</u>

2       Plaintiff argues that with respect to her residual

3   functional capacity, the ALJ failed to 1) state clear and

4   convincing reasons, supported by substantial evidence, for

5   negative findings concerning Plaintiff's credibility; 2) state

6   legally sufficient reasons concerning Plaintiff's husband's

7   testimony, and 3) state legally sufficient reasons, supported by

8   substantial evidence in the record, for rejecting the opinion of

9   Plaintiff's treating physician, Dinesh Sharma, M.D.

10      IV. <u>Plaintiff's Testimony</u>

11      Plaintiff, who was born in 1965 and was forty-three years

12  old at the time of the hearing, testified that she had pain in

13  her neck, shoulder, back, arms, wrists, legs, and knees. (A.R.

14  71.) Her back and legs had been about the same in the past couple

15  of years, but her neck had been progressively worsening; it

16  caused migraine headaches, which in turn made it difficult for

17  Plaintiff to concentrate, and it resulted in a cold, numb feeling

18  in the jaws and ears. (A.R. 87-88.) Plaintiff testified that she

19  had "mild carpal tunnel" in both wrists, although Dr. Sharma had

20  told her that the jerkiness and pain in her hands was due to her

21  neck condition. (A.R. 89.)

22      Monthly injections in the neck helped loosen the muscles and

23  increase mobility. (A.R. 71-72.) Dr. Sharma had also recommended

24  a traction unit for Plaintiff's neck for use at home, and she was

25  awaiting approval through worker's compensation. (A.R. 72.) She

26  used the TENS unit, which helped, four days a week for most of

27  the day, and even slept with it on really low. She would have

28  used it more, but it irritated her skin. (A.R. 73.) For two years

1  she had taken Darvocet and Naproxen for pain and inflammation,
2  Ambien for sleep, and three to six Soma daily to relax her
3  muscles. The medications helped but caused chronic constipation,
4  and the Soma made her "loopy" to the point that she did not feel
5  competent to drive. She experienced soreness after the
6  injections. (A.R. 74-75, 84, 86.) She used a cane three to four
7  days a week when she left her small house and believed that she
8  should use it more often for stability, but she was tired of
9  dragging it around. (A.R. 76.) She sometimes used a shopping cart
10 as a walker and also used motorized carts to shop, but she tried
11 to follow her doctor's advice to walk as much as possible. (A.R.
12 76-77.) She sometimes took her son to help her with shopping.
13 (A.R. 78.)

14     Plaintiff awoke early, fixed lunch and coffee for her
15 husband, and drove several times a week (A.R. 85-86.)

16     Plaintiff could lift and briefly carry about ten pounds,
17 stand a maximum of two hours but on an average for thirty minutes
18 if she was able to move around, sit for about two hours maximum,
19 and walk less than a block. She could not lift ten pounds for two
20 to three hours of an eight-hour day. (A.R. 89.) She would take
21 four to five rest breaks lasting fifteen minutes to half a day in
22 an eight-hour day; she had four to five really bad days a month.
23 She sometimes had trouble writing for prolonged periods and
24 grasping small things because her thumb would lock up. She could
25 use a keyboard for thirty or forty-five minutes until her wrist
26 tired to the point of weakness and quivering; she had no typing
27 skills. (A.R. 80-84.)

28     For a month and one-half, Plaintiff had been temporarily

baby sitting her grandchildren with the help of her son, with whom she shared the money she made. (A.R. 78.)

Plaintiff testified that Dr. Sharma had said he would "put in for" surgery for Plaintiff's neck when she was ready, but Plaintiff was scared by the uncertainty of what would happen to her. (A.R. 86.)

V. Testimony of Plaintiff's Husband

Steven Lambert, Plaintiff's husband of twenty-seven years, testified that he could tell when Plaintiff was in pain because she complained, cried, and was unable to do normal, routine, household things such as cook without complaining of pain; he confirmed that grasping things was a problem sometimes. She could not sit for prolonged periods without pain and needing to move around. She used the cane sixty to seventy percent of the time, and monthly she had at least three to four bad days on which she was unable to do anything. (A.R. 90-94.)

VI. Medical Evidence

On December 28, 2000, David Tenn, M.D., of the Valley Industrial Medical Group examined Plaintiff for a work injury she sustained on November 24, 2000, when she had been using a floor scrubber machine seven hours a day on a regular basis and began to experience bilateral shoulder pain with radiation into both forearms. (A.R. 334-35, 340.) There was mild diffuse tenderness of the trapezius bilaterally without appreciable spasm, and mild tenderness over the thenar area of the right thumb. The assessment was improved overuse myalgias of the upper extremities and upper back and neck, improved with conservative treatment,

9

including physical therapy; residual complaints did not require any extensive work-up. Plaintiff was to complete physical therapy and was released to regular work on a trial basis because she had been moved to a position folding clothes on the night shift. Id.

In January 2001, Plaintiff visited Dr. Pradeep K. Kamboj, M.D., concerning her worker's compensation injury in her hands and shoulders due to use of a floor scrubber at work. Examination showed tenderness of the palmer aspect of the right thumb overlying the metacarpal phalangeal area as well as myofascial stiffness of the trapezius bilaterally. The asssessment was trigger thumb, right side, to be treated with a brace and Vioxx. (A.R. 409.) Several weeks later Dr. Kamboj assessed myofascial neck pain based on a finding of stiffness of the trapezius bilaterally, with the remainder of the exam being unremarkable. Plaintiff was gradually improving. (A.R. 408.) In April 2001, Plaintiff reported she was felling a little better. (A.R. 407.)

Dr. Dinesh Sharma, M.D., a treating specialist in physical medicine and rehabilitation, saw Plaintiff on April 17, 2001, for her upper extremity pain. Paraspinal and trapezius muscles were mildly to moderately tender, neck mobility was sixty percent of normal, Spurling's maneuver was mildly positive on turning to the right and into the right shoulder as well as in turning to the left on extension. Both shoulder girdles had good mobility with some tenderness in the parascapular region. Plaintiff had mild tenderness along the lateral aspect of the elbows and on the left wrist dorsum, mildly positive Phalen's sign on the right, and slight weakness of the right hand. Dr. Sharma diagnosed cervical radiculitis, bilateral, left greater than right, and overuse

syndrome of the upper extremities bilaterally, to be explored
with tests and to be treated with medication (Vioxx and
Zanaflex). (A.R. 471.)

Dr. Sharma opined that nerve conduction studies of the right
arm performed on May 9, 2001, were mildly abnormal and appeared
to reflect evidence of borderline compression of the median
sensory fibers, which suggested borderline carpal tunnel syndrome
(CTS). (A.R. 472.) Electromyographic examination of the muscles
undertaken the same day was normal. (A.R. 473.) Dr. Sharma opined
that a nerve conduction study and an electromyographic
examination of the left arm performed on May 16, 2001, were
normal. (A.R. 467.) An x-ray and CT scan of the cervical spine
reflected a benign-appearing lesion of uncertain etiology in the
C7 vertebral body, hypolordosis that was possibly secondary to
positioning and/or muscle spasm, and degenerative disc disease
with osteophytes from the C5 to C7 levels and a slight narrowing
of the C6/C7 disc space without gross evidence of large,
posterior disc protrusions or significant narrowing of the neural
canals. (A.R. 464.) Dr. Mario Deguchi, a radiologist, opined that
a MRI study of the cervical spine performed on May 9, 2001,
reflected reversal of the cervical curvature, also possibly due
to positioning or muscle spasm; mild degenerative disc disease
with a small anterior disc protrusion at C6/C7; a bone lesion of
uncertain etiology involving the C7 vertebral body; and a
posterocentral disc protrusion measuring approximately three
millimeters at C5/C6. (A.R. 474-75.)

Dr. Deguchi opined that an x-ray and CT scan of the
cervical spine taken in June 2001 demonstrated the same

impressions as the MRI study from May 9, 2001. Dr. Deguchi stated there was only a slight narrowing of the C6/C7 intervertebral disc space and no evidence of large posterior disc protrusions or significant narrowing of the neural canals. The posterocentral disc protrusion at C5/C6 measured about three millimeters. (A.R. 391-93.)

In October 2001, at Dr. Sharma's request, neurosurgeon Sana U. Bhatti, M.D., examined Plaintiff concerning her upper body pain, which Plaintiff reported continued but was under better control with Ultram, Vioxx, and physical therapy. Plaintiff denied numbness, paresthesis, or difficulty with gait; she reported that she had been diagnosed with CTS, and she continued working with an assignment which did not require significant manual work. On examination, neck and back were non-tender to palpation and percussion, extremities were unremarkable, motor strength was 5/5 throughout, and sensation was intact. The impression was cervical sprain; Dr. Bhatti found no evidence of radiculopathy or myelopathy by history or exam; no operative intervention was indicated. The lesion at C7 was a Schmorl's node and did not require any further followup. (A.R. 460.)

In November 2001, an x-ray of the lumbar spine was negative for a fracture or destructive process; vertebral body heights and disc spaces were maintained. (A.R. 390.) Plaintiff complained to Dr. Kamboj about chest pain and tightness; an EKG was unremarkable. Dr. Kamboj gave Plaintiff Ibuprofen and ordered Plaintiff's Xanax refilled for Plaintiff's complaint of anxiety. (A.R. 406.)

Dr. Sharma prescribed a TENS unit on March 12, 2002. (A.R.

499.) Dr. Kamboj prescribed Bextra and Ultracet for back pain and neck stiffness on May 7, 2002. (A.R. 406.)

Plaintiff suffered another work injury on May 27, 2002, when she caught a twenty-five-pound rack of falling purses. As to that injury only, on June 4, 2002, she was considered permanent and stationary, and Dr. Yale opined that she was able to resume regular duty work status with no residual deficits, limitations, disability, or need for any further medical followup. (A.R. 331-33.)

In June 2002, Dr. Sharma noted that Plaintiff was improving with medications and physical therapy. (A.R. 449.) In July 2002, he diagnosed her with "CTS." (A.R. 447.) In August 2002, when Plaintiff complained of increasing numbness, nerve conduction studies of the right arm were repeated, and Dr. Sharma concluded that no significant changes were noted; continued anti-inflammatory medication and bracing were recommended. (A.R. 445.) On November 6, 2002, Dr. Sharma directed Plaintiff to refrain from forceful pulling with her hands at work. (A.R. 442.)

Plaintiff suffered another work injury on November 10, 2002, involving pain in the lower back and shooting from the buttocks down both legs due to bending. She was examined at the emergency room (ER) by Douglas Malcolm, M.D., who assessed bilateral paresthesias in the lower legs, low back pain, cervical disc disease, bilateral CTS, and asthma. The physical exam revealed no specific tenderness over the thoracic or lumbar spine, no paraspinous muscle spasm, no sacroiliac or sciatic notch tenderness, normal straight leg raising, deep tendon reflexes 2+ throughout, intact sensation to light touch, full range of motion

13

of the back, and normal gait. No tests were run on Plaintiff's nerves; Plaintiff had reported that she had bilateral carpal tunnel syndrome, and she wore bilateral CTS splints. (A.R. 388-89.)

On November 13, 2002, Dr. Sharma noted that the wrist braces were being used and were working; Plaintiff had no new complaints. The diagnosis was cervical radiculitis, overuse syndrome, and lumbar spine flare-up; Plaintiff continued to work with light duty. (A.R. 441.)

On November 22, 2002, Dr. Yale reported that Plaintiff appeared with a TENS unit about her cervical region, wrist splints, and an aluminum walker that she had obtained from a deceased relative. Dr. Yale found normal and mild findings on examination, but Plaintiff sought complete disability. He reported that she had "an extreme somatization personality," and he placed her on modified duty work status from November 19, 2002, through November 25, 2002, restricting her to light work, limited standing and walking, and prohibiting any climbing of stairs or ladders, lifting over five pounds, or repetitive bending. He also prescribed physical therapy, and he planned to follow up with consideration of psychological evaluation for somatization disorder. (A.R. 325-30.) In December 2002, Dr. Sharma noted that Plaintiff was to be off work one month and was to see a neurologist. (A.R. 437.)

Alan M. Birnbaum, M.D. a psychiatrist and neurologist, performed a neurological consultation and examined Plaintiff on January 30, 2003, concerning pain in the back and legs from the work injury of November 10, 2002. (A.R. 345-61.) Dr. Birnbaum did

not have records of previous studies. Plaintiff reported that she then took only Darvocet and Ibuprofen for what an MRI study had shown were two herniated discs in her neck. She also stated that nerve testing by Dr. Sharma showed carpal tunnel, with the results of a second round of electro-diagnostic testing being worse than the first round such that Plaintiff expected she would have surgery for her CTS. (A.R. 349.) Physical therapy and injections for the upper body had not helped. (A.R. 348.)

Dr. Birnbaum described Plaintiff as "moderately dramatic," (A.R. 352.) He concluded that with respect to her axial-mechanical lower back pain, the symptomatology was atypical and not suggestive of lumbosacral radiculopathy. No intrinsically serious disorder was demonstrated, and although the onset of symptoms as described by Plaintiff was dramatic and would be anticipated to reflect a rather massive central disc herniation, the actual physical exam failed to confirm findings that might support such a conclusion. With respect to her history of CTS, the symptomatology was again somewhat atypical and was being treated with splints and not surgery. With respect to her cervical disc disease, the current examination did not demonstrate focal cervical radiculopathy or myelopathy. Because of the extended course of treatment without resolution of symptoms and the previous negative neurosurgical consultation, Dr. Birnbaum had similar reservations regarding the intrinsic seriousness of Plaintiff's condition of the upper body. (A.R. 356-58.) He recommended a MRI study of the lumbosacral spine despite the fact that his expectation of any medically significant, positive result was quite limited. Further, because

of Plaintiff's failure to respond to the long course of care for her cervical disorder, Dr. Birnbaum found it unlikely that Plaintiff would respond to virtually any form of intervention for her lower back complaints. (A.R. 358.) If the MRI were to show nothing but age-related changes, then he would have no basis to conclude that Plaintiff sustained any medically significant industrial injury on November 10, 2002. As to the claim of November 24, 2000, Plaintiff appeared to be permanent and stationary as of January 30, 2003. (A.R. 358.)

Radiologist Paul M. Loeffler, M.D., opined that an MRI study of the lumbar spine performed for Dr. Birnbaum on January 28, 2003, revealed mild intervertebral disc degenerative changes at L4-5 without evidence of spinal canal stenosis or additional, significant abnormality to account for the patient's clinical presentation. (A.R. 547.) Upon receipt of medical records, Dr. Birnbaum stated in an addendum that findings on examination after Plaintiff's onset of back symptoms were normal and identified no neurological dysfunction. He also noted Dr. Yale's note of November 27, 2002, in which he had reported that Plaintiff had a collapsible walker with her, although she used it minimally and was observed putting it in her car and entering the driver's seat in a normal fashion; further, Dr. Yale concluded that Plaintiff could pursue regular work. (A.R. 360-61.)

On January 8, 2003, after Plaintiff's evaluation by Dr. Birnbaum, Dr. Sharma continued to diagnose Plaintiff with lumbar spine strain and cervical spine radiculitis and to treat her with medications (Ativan, Ambien, Soma, and Bextra). (A.R. 436, 430.) In February and May 2003, Dr. Sharma ordered Plaintiff off work

1  for a month. (A.R. 435, 429.) Plaintiff's medications included
2  Tylenol with Codeine as of May 2003. (A.R. 430.) In July 2003,
3  Plaintiff reported that therapy was having good results. (A.R.
4  427.) In later 2003 and early 2004, Dr. Sharma continued with
5  treatment consisting of therapy and Bextra, Motrin, Darvocet, and
6  Soma. (A.R. 422-26.)

7       On February 23, 2004, James L. Strait, M.D., an orthopedic
8  surgeon, performed an agreed medical examination concerning
9  Plaintiff's neck, upper extremities, low back, and lower
10 extremities. (A.R. 365-77.) Plaintiff reported her history of
11 upper body pain with gradual onset in November 2000 resulting in
12 modified work and treatment, the lower back injury caused by the
13 purse rack in May 2002 which resolved gradually after two months
14 off work, and the sudden onset of severe low back and leg pain
15 after a lot of bending in November 2002. Plaintiff reported doing
16 light housework and cooking, driving short distances, and
17 shopping with a motorized cart. Dr. Strait assessed only
18 Plaintiff's upper body condition because he believed that a MRI
19 study of the lower spine was needed. The exam of the neck showed
20 normal spinal alignment, no muscle spasm or atrophy, generalized
21 tenderness in the neck and upper back, and eighty per cent of the
22 normal range of motion with pain on the extremes. The exam of the
23 upper extremities showed full, painless range of motion of both
24 shoulder joints, no atrophy of the arms or forearms by
25 measurement, no intrinsic muscle atrophy in either hand, normal
26 reflexes, negative Tinel's and Phalen's signs, normal sensory
27 exam, and normal grip strength and sensory exam. Exam of the
28 upper back showed tenderness over the thoracic spine and

1 paraspinous muscles, no muscle spasm or atrophy, and full range

2 of motion of the thoracic spine without pain. Examination of the

3 lower back showed normal spinal alignment; tenderness in the

4 lumbosacral region and sciatic notches; an absence of paraspinous

5 muscle tenderness, spasm, or atrophy; and eighty per cent of

6 normal range of motion with pain on the extremes. Examination of

7 the lower extremities showed negative bilateral straight leg

8 raising in seated and supine position, no calf or thigh atrophy,

9 full range of motion of both hips without pain, and normal deep

10 tendon reflexes, sensory and vascular exam, strength, and

11 reflexes.

12      Dr. Strait's impression was discogenic neck and upper

13 extremity pain, and probably discogenic low back pain; Plaintiff

14 was permanent and stationary and should have conservative

15 treatment with medications, including Ambien and Lorazepam. He

16 concluded that Plaintiff had degenerative cervical disc disease

17 with no evidence of disc herniation, radiculopathy, or peripheral

18 neuropathy. Plaintiff was precluded from heavy lifting and

19 repetitive overhead work due to her neck and upper extremities.

20 (A.R. 365-77.)

21      Jason Cord, M.D., opined that an MRI study of the

22 lumbosacral spine taken on April 13, 2004, showed relatively mild

23 degenerative disc disease most pronounced at the L4/5 and L5/S1

24 levels. (A.R. 585.) Mel Okeon, M.D., opined that an MRI study of

25 the cervical spine taken on April 29, 2004, reflected at C5/6

26 most prominently, but also at C6/7 and C7/T1, the formation of a

27 minimal posterior bulge of the disc and osteophyte measuring one

28 to three millimeters but without a herniated fragment, spinal

1  stenosis, or encroachment into a neural foramen. The remaining
2  cervical disc levels were normal. (A.R. 415, 584.)

3      In June 2004, Dr. Sharma ordered EMG and NCV testing of the
4  lower extremities because Plaintiff complained of pain and
5  numbness. (A.R. 412.)The results were normal. (A.R. 541-42.) In
6  June, Plaintiff visited the ER because of chest pain, which was
7  found to be probably musculoskeletal; x-rays of the chest,
8  cardiac monitoring, an EKG, a CBC, a renal panel, and cardiac
9  enzyme tests were all relatively within normal limits. Plaintiff
10 was given a shot of Toradol IM and was discharged to follow up
11 with her private medical doctor. (A.R. 381-84, 570.) Afterwards,
12 Dr. Kamboj assessed the incident as involving chest pain,
13 myofascial with anxiety component, which he treated with
14 Ibuprofen, noting that at Dr. Sharma's order, Plaintiff was
15 already taking many other medications, including Ativan for
16 anxiety. (A.R. 397, 571.)

17     On June 16, 2004, Dr. Sharma found moderate tenderness of
18 the low back, L5-S1 paraspinals, sacroiliac joints, and sciatic
19 notches and mild tenderness along the iliac crest; slow and
20 antalgic gait; restricted range of motion; but otherwise normal
21 signs and findings, including good bulk, tone, and fair strength
22 in the lower extremities. He assessed lower back chronic pain
23 with strain, degenerative disc disease at L4-5, and depression
24 based on Plaintiff's tearfulness during the exam. He planned
25 treatment with Motrin and Soma, physical therapy, and injections;
26 Tylenol with codeine was discontinued. (A.R. 544-46.)

27     In July 2004, a nerve conduction study of the bilateral
28 upper extremities was performed by Dr. Sharma because Plaintiff

1   complained of pain and numbness in the hands. There was evidence

2   of mild CTS and mild to moderate tardy ulnar palsy, a result that

3   was a mild progression of the right side findings as compared

4   with the evaluation of May 2001. An electromyographic exam was

5   normal. (A.R. 537-38.)

6      In August 2004, state agency medical consultant Archimedes

7   Garcia, M.D., a psychiatrist, opined that Plaintiff's mental

8   impairment of anxiety was not severe. (A.R. 510-26.)

9      On February 1, 2005, consultative examiner Leslie H.

10   Lessenger, Ph.D., performed a psychological evaluation of

11   Plaintiff, who reported two herniated discs in her neck and back,

12   carpal tunnel in both hands, and constant pain that began in

13   November 2002 and caused her to stop work in November 2002.

14   Plaintiff was oriented and exhibited a cooperative attitude,

15   euthymic affect, average abstract reasoning and intellectual

16   functioning with ability to perform simple arithmetic and read

17   and write a simple sentence, intact memory, good judgment,

18   average insight, and adequate concentration for conversation, but

19   she recited four of seven digits in reverse and made errors on

20   serial seven's. She could spell "world" backwards without

21   difficulty. Her fund of knowledge was adequate. Dr. Lessenger

22   made no diagnosis on axes I and II, and a global assessment of

23   functioning (GAF) of seventy was assessed. The doctor concluded

24   that any vocational limitation suffered by Plaintiff was due to

25   physical problems, and not to any cognitive or emotional

26   impairment. Plaintiff could manage benefit payments on her own

27   behalf. (A.R. 548-50.)

28      In March 2005, state agency consultant Evangeline Murillo,

20

M.D., opined that based on the lack of any treatment and the
opinion of Dr. Lessenger, Plaintiff had no medically determinable
mental impairment. (A.R. 552-55.) In the same month state agency
medical consultant Ernest Wong, M.D., affirmed an earlier
assessment and opined that Plaintiff could lift fifty pounds
occasionally and twenty-five pounds frequently, sit and stand
and/or walk about six hours in an eight-hour workday, engage in
unlimited pushing and pulling, frequently climb, balance, stoop,
kneel, crouch, and crawl, and engage in only occasional overhead
reaching with bilateral upper extremities. (A.R. 556-63.)

In May 2005, Dr. Sharma diagnosed CTS on the right. (A.R.
579.)

In October 2005, Dr. Sharma reported that EMG nerve
conduction studies of the right and left upper extremities were
mildly abnormal, reflecting borderline carpal tunnel bilaterally,
mildly more on the right, and he recommended conservative
treatment. Electromyographic examination of both upper
extremities was normal. (A.R. 567-69.)

On July 26, 2006, Dr. Sharma completed a "RESIDUAL
FUNCTIONAL CAPACITY QUESTIONNAIRE" form based on his having seen
Plaintiff monthly for about two years and his diagnosis of
cervical and lumbar arthritis and low back pain with strain/MRI
and with evidence of degenerative disc disease at L4-5, which
could be expected to last at least twelve months. (A.R. 593-97.)
He characterized Plaintiff's pain as constant in the back and
neck and worsening with activities of lifting and bending. He
opined that the impairments were reasonably consistent with the
symptoms and functional limitations; Plaintiff was not a

1  malingerer, emotional factors did not contribute to the severity
2  of her symptoms and limitations, and no psychological conditions
3  affected her physical condition. The clinical findings, objective
4  signs, and test results showing the impairment were MRI results
5  showing degenerative disc disease of the cervical and lumbosacral
6  spine. Side-effects of medication included drowsiness;
7  Plaintiff's symptoms were likely to produce good and bad days,
8  with the bad days numbering more than four days a month.
9  Plaintiff could carry ten pounds occasionally and twenty and
10 fifty pounds rarely, and she could occasionally look down with
11 sustained flexion of the neck, turn the head right to left, look
12 up, hold the head in a static position, twist, stoop, crouch, and
13 climb ladders and stairs. Plaintiff could repetitively grasp,
14 turn, or twist objects and reach with the arms, including
15 overhead, only twenty-five per cent of the time. Symptoms were
16 severe enough to interfere frequently with Plaintiff's attention
17 and the concentration needed to perform even simple work tasks;
18 Plaintiff could maintain concentration for fifteen minutes at one
19 time and was capable of only low stress jobs because stress
20 increased her pain. Plaintiff could walk one block, sit and stand
21 fifteen minutes each at one time and less than two hours in an
22 eight-hour working day with a need to include periods of walking
23 around for five minutes every thirty minutes, and with a need to
24 shift positions at will from sitting, standing, or walking and to
25 take five-minute breaks each hour. Plaintiff was required to use
26 a cane while occasionally standing or walking. (A.R. 593-97.)

27      On September 29, 2006, after Plaintiff complained of knee
28 pain, studies of Plaintiff's knees showed minimal, hypertrophic

22

changes of the margins of the femoral condyles, tibial plateaus, and patella consistent with mild, early degeneration. (A.R. 647-48.)

On October 20, 2006, consulting examiner Juliane Tran, M.D., a specialist in physical medicine, performed a comprehensive neurologic evaluation of Plaintiff, who complained of pain of 6-7/10 and numbness which had been relieved by therapy in the past. (A.R. 608-16.) She reported that a bone spur was pressing on the nerve. She reported that she had been using a four-prong cane prescribed in 2002. Her pain medication was Darvocet N100 and Naproxen, and she used a TENS unit. She had not received physical therapy for a year and one-half. Dr. Tran noted that despite the nerve conduction study noted for borderline carpal tunnel syndrome bilaterally, it appeared from the evaluation of the nerve conduction study of the upper extremities that the median motor sensory nerve bilaterally was within normal limits. (A.R. 608.) Plaintiff ambulated slowly on and off the table and around the room without a cane; she was able to don and doff her shoes and the right wrist brace. Straightaway gait showed an exaggerated, antalgic gait; toe-heel and tandem walking was fairly slowly done with painful behavior, and she did not use an assistive device. Range of motion of the lumbar and cervical regions was limited and sometimes painful. Straight leg raising, Neher's, Tinel's, and Phalen's were negative. Tenderness to palpation was found over the cervical spine, cervical facet joint, occipital muscle in the upper trapezius and second costochondral junction, epicondyles of both elbows, medial aspect of the knees, bilateral trochanter areas, and bilateral gluteal

1  regions. There was pain in bilateral sciatic notches. Motor
2  strength was 5/5 throughout, sensory and reflex exams were
3  normal, and Babinski was negative.

4      Dr. Tran opined that Plaintiff's complaints and examination
5  showing tender points throughout the body with multiple
6  symmetrical sites consistent with fibromyalgia, along with
7  decreased cervical and lumbar range of motion, suggested
8  fibromyalgia; Dr. Tran could not rule out lumbar disc disease,
9  but despite Plaintiff's complaints of neck and back pain, there
10 was no evidence from the exam to suggest lumbar or cervical
11 radiculopathy. Dr. Tran stated:

12      Examination is noted for an exaggerated antalgic gait
       and painful behavior.
13
14 (A.R. 611.) The doctor concluded that Plaintiff could lift twenty
   or twenty-five pounds occasionally and ten pounds frequently,
15
   stand and walk no more than six hours a day with unrestricted
16
   sitting, frequently climb, balance, kneel, crouch, crawl, and
17
   stoop, and there were no other limitations. Plaintiff did not
18
   need to use an assistive device to ambulate. (A.R. 610-12.)
19
20      In November 2006, Dr. Kamboj noted that Plaintiff was
   experiencing numbness and discomfort on the left side of the
21
   face. (A.R. 617.)
22
23      In January and October 2007, Plaintiff continued to have
   headaches and pain in the neck, lower back, and extremities; her
24
   greater occipital and bilateral sciatic regions were injected
25
   with Dexamethasone and Lidocaine. Anti-inflammatory medications,
26
   muscle relaxants, and anti-depressants were continued. (A.R. 620,
27
   634, 642.)
28

1    On March 28, 2008, Dr. Sharma completed another "RESIDUAL
2 FUNCTIONAL CAPACITY QUESTIONNAIRE" form based on his diagnosis of
3 cervical and lumbosacral radiculitis and degenerative disc
4 disease shown on an MRI, which resulted in moderate to severe
5 pain in the back, leg, neck, and arm that was constant and could
6 be expected to last more than a year. (A.R. 654-58.) He stated
7 that Plaintiff's prognosis was fair to good. He opined that the
8 impairments were reasonably consistent with the symptoms and
9 functional limitations; Plaintiff was not a malingerer, emotional
10 factors did not contribute to the severity of her symptoms and
11 limitations, and no psychological conditions affected her
12 physical condition. Side-effects of medication included
13 drowsiness; Plaintiff's symptoms were likely to produce bad days
14 numbering more than four per month. Plaintiff could only rarely
15 carry up to ten pounds, look down with sustained flexion of the
16 neck, turn the head right to left, look up, hold the head in a
17 static position, twist, stoop, crouch, and climb ladders and
18 stairs. Plaintiff had no significant limitations in repetitive
19 reaching, handling, or fingering. Symptoms were severe enough to
20 interfere frequently with Plaintiff's attention and concentration
21 needed to perform even simple work tasks; Plaintiff could
22 maintain concentration and attention for ten minutes at one time
23 and was incapable of even low-stress jobs because of her neck and
24 back pain. Plaintiff could walk two blocks, sit and stand fifteen
25 minutes each at one time and less than two hours in an eight-hour
26 working day with a need to include periods of walking around for
27 five minutes every fifteen minutes, and with a need to shift
28 positions at will from sitting, standing, or walking and to take

1  ten-minute breaks each hour. Plaintiff was required to use a cane

2  while occasionally standing or walking. (A.R. 593-97.)

3       Progress notes of Dr. Sharma from May 2001 through January

4  2006 reflect that Plaintiff's subjective complaints were noted

5  over forty times to be "Doing fair." (A.R. 469, 466, 461-62, 449-

6  56, 446, 436-43, 434, 430-33, 420-28, 417-18, 411, 533-35, 528-

7  31, 588, 580-83, 577-78, 575, 618, 621-28, 630-33, 635-39, 640,

8  641, 643.)

9       VII. <u>Findings concerning Plaintiff's Credibility</u>

10       Plaintiff argues that the ALJ failed to state clear and

11  convincing reasons for finding that although Plaintiff's

12  medically determinable impairments reasonably could have been

13  expected to produce the alleged symptoms, Plaintiff's statements

14  concerning the intensity, persistence, and limiting effects of

15  the symptoms were not credible to the extent they were

16  inconsistent with the ALJ's RFC assessment. (A.R. 20.)

17         A. <u>Legal Standards</u>

18       Under the case law of this circuit, without affirmative

19  evidence showing that the claimant is malingering, the

20  Commissioner's reasons for rejecting the claimant's testimony

21  must be clear and convincing. If an ALJ finds that a claimant's

22  testimony relating to the intensity of pain and other limitations

23  is unreliable, the ALJ must make a credibility determination

24  citing the reasons why the testimony is unpersuasive. The ALJ

25  must specifically identify what testimony is credible and what

26  testimony undermines the claimant's complaints. In this regard,

27  questions of credibility and resolutions of conflicts in the

28  testimony are functions solely of the Commissioner. <u>Valentine v.</u>

Astrue, 574 F.3d 685, 693 (9th Cir. 2009) (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir.1999)).

Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment. Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007). Additional factors to be considered in weighing credibility include the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the person receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529, 416.929; S.S.R. 96-7p.

B. Analysis

Here, the ALJ summarized Plaintiff's testimony concerning her neck, back, shoulder, arm, wrist, and leg pain; her treatment and appliances, consisting of monthly injections, the TENS unit, the cane three to four days a week, the motorized carts for shopping, and the anticipated traction apparatus for her neck; her ability to sit for two hours at a time and stand for only twenty to thirty minutes but not walk even a block; her difficulty with a manual toothbrush and limited ability to use a

1  keyboard; and her daily activities of fixing lunch for her
2  husband and driving around town. (A.R. 20.)

3       The ALJ then cited multiple reasons for her findings.

4       The ALJ relied on the inconsistent medical evidence. (A.R.
5  20.) Although the inconsistency of objective findings with
6  subjective claims may not be the sole reason for rejecting
7  subjective complaints, Light v. Chater, 119 F.3d 789, 792 (9th
8  Cir. 1997), it is one factor which may be considered with others,
9  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v.
10 Commissioner 169 F.3d 595, 600 (9th Cir. 1999); Burch v. Barnhart,
11 400 F.3d 676, 681 (9th Cir. 2005).

12      In this case, the ALJ referred to the findings of consulting
13 neurologist Dr. Julianne Tran, who in October 2006 reported that
14 although Plaintiff presented with significant complaints of neck
15 and back pain, there was no evidence upon examination to suggest
16 any cervical or lumbar radiculopathy. The ALJ noted that Dr. Tran
17 concluded that Plaintiff could lift twenty pounds occasionally
18 and ten pounds frequently and stand and walk for at least six
19 hours a day without restrictions on sitting or other postural or
20 non-exertional limitations. (A.R. 20.) The inconsistency of
21 medical opinions with a claimant's subjective complaints is
22 appropriately considered by an ALJ in rejecting a claimant's
23 credibility. Stubbs-Danielson, 539 F.3d 1169, 1175 (9th Cir.
24 2008). The ALJ's reasoning was clear and convincing.

25      Further, the ALJ noted that although Plaintiff had testified
26 that she could concentrate for only an hour at a time, consulting
27 psychological examiner Dr. Lessenger found that although
28 Plaintiff might suffer from chronic pain due to medical

28

conditions, she had no vocational limitations due to any cognitive or emotional impairment, and she was assigned a global assessment of functioning (GAF) of 70, indicating no more than some mild symptoms. (A.R. 21.)

The ALJ reasoned that the medical record as a whole supported the findings of both consultative examiners that Plaintiff remained physically and mentally capable of sustained work activities. (A.R. 21.) The ALJ noted that following her worker's compensation claim for bilateral shoulder and upper extremity pain, physical examination revealed full range of motion and negative Phelan's and Tinel's tests despite the claimant's complaints. (A.R. 21.) The agreed medical examiner in the original worker's compensation proceeding found that Plaintiff was permanent and stationary with discogenic neck and upper extremity pain despite the lack of any new diagnostic studies and only minimal changes in previously existing studies; he concluded that Plaintiff was precluded from heavy lifting and repetitive overhead work, but he noted the MRI study of the cervical spine that showed only minimal bulge and disc protrusion, and the normal EMG and nerve conduction studies that showed no evidence of carpal tunnel syndrome (CTS). (A.R. 21.) The ALJ noted the very minimal cervical findings during the consultative, neurosurgical examination. (A.R. 21-22.) She also noted that although in June 2004 Dr. Sharma had diagnosed chronic low back pain and strain and had relied on MRI evidence of degenerative disc disease, the actual MRI revealed only relatively mild degenerative disc disease. (A.R. 22.) More recent test results and findings of Dr. Sharma included essentially

normal x-rays of Plaintiff's knees. (A.R. 22.) The Court notes that substantial evidence supported this clear and convincing reasoning.

The ALJ relied on the nature of the treatment that Plaintiff received. (A.R. 21-22.) Scant treatment records from August 2006 through March 2008 showed only routine medication management for Plaintiff's complaints and conditions, such as facial numbness, bladder control issues, asthma, and right ear pain. (A.R. 21.) The neurosurgical consultation revealed that Plaintiff needed only conservative, non-surgical treatment for pain, and the treatment records reflected medication management of Plaintiff's complaints of low back and neck pain. (A.R. 21-22.)

The ALJ relied on evidence that Plaintiff exaggerated her symptoms. Earlier in the decision, she had discussed Plaintiff's exaggeration in connection with the suggestion that Plaintiff was suffering from fibromyalgia, a diagnosis which the ALJ noted had not been made by an treating physician. He then continued in pertinent part:

> It is clear form the medical record that
> the claimant is exaggerating her pain symptoms,
> particularly given the lack of any diagnostic signs
> upon physical examination, repeated diagnostic findings
> of only mild or minimal changes, negative EMG studies,
> and the claimant's exaggerated pain and obviously
> painful behavior during the recent consultative
> examination (citation omitted.)

(A.R. 19.)

In the later portion of the decision concerning credibility findings, the ALJ noted that Dr. Tran had reported that her examination of Plaintiff was notable for an exaggerated, antalgic gait and exaggerated painful behavior. The ALJ referred to

1 Plaintiff's report to treating emergency room (ER) staff that she
2 had bilateral CTS and significant cervical disc disease, which
3 the ALJ characterized as "[c]learly... an exaggeration." (A.R.
4 21.) Plaintiff had also complained of chest pain at the ER, but a
5 cardiac monitor and EKG studies revealed a normal sinus rhythm,
6 and her chest pain was noted to be atypical and probably
7 musculoskeletal. (A.R. 21.)

8      Amplification of symptoms can constitute substantial
9 evidence supporting the rejection of a subjective complaint of
10 severity of symptoms. Matthews v. Shalala, 10 F.3d 678, 680 (9th
11 Cir. 1993). A claimant's not having been a reliable historian and
12 having presented conflicting information about her history may
13 appropriately be considered. Thomas v. Barnhart, 278 F.3d 947,
14 959 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's
15 testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087,
16 1090 (9th Cir. 1999).

17     The evidence reflects that Plaintiff repeatedly exaggerated
18 the seriousness of various symptoms to medical staff. The ALJ's
19 reasoning was clear and convincing in the circumstances of the
20 present case.

21     Plaintiff points to the objective evidence in the record
22 that supports or could be considered consistent with Plaintiff's
23 subjective complaints. However, it is not the role of this Court
24 to redetermine Plaintiff's credibility de novo; although evidence
25 supporting an ALJ's conclusions might also permit an
26 interpretation more favorable to the claimant, if the ALJ's
27 interpretation of evidence was rational, this Court must uphold
28 the ALJ's decision where the evidence is susceptible to more than

1  one rational interpretation. <u>Burch v. Barnhart</u>, 400 F.3d 676,
2  680-81 (9th Cir. 2005).

3       In summary, the Court concludes that the ALJ cited clear and
4  convincing reasons for rejecting Plaintiff's subjective
5  complaints regarding the intensity, duration, and limiting
6  effects of her symptoms, and that the ALJ's reasons were properly
7  supported by the record and sufficiently specific to allow this
8  Court to conclude that the ALJ rejected the claimant's testimony
9  on permissible grounds and did not arbitrarily discredit
10 Plaintiff's testimony.

11      VIII. <u>Findings concerning the Testimony of Mr. Lambert</u>

12      Plaintiff contends that the ALJ failed to give reasons why
13 she rejected the testimony of Plaintiff's husband. Defendant
14 argues that the decision must be interpreted as containing a
15 single statement of reasons that applied jointly to the
16 credibility of both Plaintiff and her husband. Defendant cites
17 <u>Moore v. Apfel</u>, 216 F.3d 864, 867 (9th Cir. 2000) and argues that
18 because this issue of credibility findings was raised in
19 Plaintiff's brief submitted to the Appeals Council on his final
20 request for review (A.R. 667-68), the Court should interpret the
21 denial of the request for review as an interpretation by the
22 Appeals Council of the ALJ's decision that is consistent with
23 Defendant's.

24      It is established that lay witnesses, such as friends or
25 family members in a position to observe a claimant's symptoms and
26 daily activities, are competent to testify to a claimant's
27 condition; the Commissioner will consider observations by non-
28 medical sources as to how an impairment affects a claimant's

ability to work. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ cannot discount testimony from lay witnesses without articulating specific reasons for doing so. <u>Id.</u> at 919.

Lay witnesses area categorized as other, non-medical sources under the pertinent regulations. 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). Information from such other sources cannot establish the existence of a medically determinable impairment, but it may be considered in determining the severity and effects of an impairment or combination thereof. Soc. Sec. Ruling 06-03p pp. 2-3. The weight to which such evidence is entitled will vary according to the particular facts of the case; it is appropriate to consider factors such as the nature and extent of the relationship with the claimant, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence. Soc. Sec. Ruling 06-03p p. 6.

Regulations provide that the adjudicator should generally explain the weight given the opinions from such other sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning when such opinions may have an effect on the outcome of the case. <u>Id.</u>

Here, in the second paragraph of the decision, the ALJ set forth the substance of the direction of the Appeals Council to her to make appropriate findings concerning the testimony of Plaintiff's husband and provide a rationale germane to his credibility. (A.R. 16.) The ALJ recited that she had considered the symptoms, the objective medical evidence, the other evidence, and the opinion evidence, and had done so in accordance with the

1  requirements of stated regulations and rulings; she expressly

2  cited Soc. Sec. Ruling 06-03p, which concerns other sources,

3  including lay witnesses.

4      After stating the law pertinent to findings concerning

5  Plaintiff's subjective complaints and credibility, the ALJ

6  recited all Plaintiff's subjective complaints. In the next

7  paragraph, she wrote:

8          Mr. Lambert testified that his wife complains of
           pain frequently and is in a bad mood when she's
9          in pain. He said she has 3 to 4 bad days a month
           and cannot get things done at home because of the
10         pain, which makes her cry. He said she complains of
           wrist pain and uses the cane 60 to 70% of the time.
11         He said she can take care of her personal needs.

12  (A.R. 20.) The ALJ thus characterized the lay testimony as

13  relating to the frequency of Plaintiff's pain and its effects on

14  Plaintiff (causing complaints, bad moods, crying, and inability

15  to get things done around the house, but permitting personal

16  care). The decision itself makes it clear that the ALJ was aware

17  of the lay testimony concerning Plaintiff's pain and understood

18  that in substance it was consistent with Plaintiff's own

19  subjective complaints about the frequency and extent of her pain.

20      The ALJ then made her findings concerning the lack of

21  credibility of Plaintiff's statements about her symptoms and went

22  on to specify the reasoning, which has been set forth hereinabove

23  in connection with the discussion of Plaintiff's credibility.

24  (A.R. 20-22.) The ALJ did not expressly advert to the husband's

25  testimony in stating the reasoning for her findings concerning

26  Plaintiff's testimony.

27      Defendant argues that it is appropriate to interpret the

28  opinion as pertaining to both spouses' testimony.

The Court notes that some leeway in interpretation has been found reasonable. For example, in Lewis v. Apfel, 236 F.3d 503, 511-12 (9th Cir. 2001), it was sufficient for the ALJ to state expressly that the testimony of family members had been considered, and to note that documented medical history and findings and prior recorded statements were contrary to the testimony. Discussions of the evidence from other portions of the decision were consulted to discern the precise evidence relied upon by the ALJ. The reviewing court found it sufficient that the ALJ noted arguably germane reasons for dismissing the family members' testimony even if his determination was not clearly linked to those reasons. Id.

The present case thus is not quite like Lewis v. Apfel, because there the finding concerning the lay witnesses was more express.

However, case before the Court is also not like Stout v. Commissioner, 454 F.3d 1050, 1053-54, 1056 (9th Cir. 2005), in which there was a complete silence as to the testimony. Here, it is clear that the ALJ knew of and considered the husband's testimony and rejected it. Further, the husband's testimony was based on his wife's complaints of crying and claiming to be unable to get work done at home; thus, the credibility of the husband was based in turn on the wife's own expressions and characterizations of her symptoms. The Court notes that the extent to which evidence was based on Plaintiff's subjective complaints was of major importance to the ALJ. For example, as will be discussed below, the ALJ likewise rejected the opinion of Dr. Sharma because it was based not on the objective evidence of

1  record, but rather on Plaintiff's subjective complaints. (A.R.
2  22.)

3      In light of the nature of the husband's testimony, the ALJ's
4  consideration of both sets of complaints, and the nature of the
5  reasoning set forth by the ALJ, it is reasonable to interpret the
6  decision as stating reasons applicable to both witnesses'
7  testimony. The Plaintiff's propensity to exaggerate her symptoms
8  and the inconsistency of her complaints with the detailed medical
9  evidence were equally germane to the husband's testimony, which
10 purported to evaluate Plaintiff's functionality based on what
11 Plaintiff's own expressions and assessments of her pain were.
12 Although certainly not a model of exposition, the decision
13 permits the adjudicator's reasoning to be followed.

14     However, the Court concludes in the alternative that should
15 the linkage of the ALJ's reasoning to the testimony of the
16 husband be considered too speculative, then to the extent that
17 the ALJ could be considered to have failed properly to set forth
18 her reasoning concerning the husband's testimony, the Court
19 concludes with confidence that no reasonable ALJ, when fully
20 crediting the husband's testimony, could have reached a different
21 disability determination. See, Stout v. Commissioner, 454 F.3d
22 1050, 1056. This is because even if credited, the husband's
23 testimony was essentially his observations of Plaintiff's own
24 expressions and assessments of her own pain, which the ALJ had
25 already rejected as exaggerated and inconsistent with the
26 treatment received and the medical record, and which the ALJ had
27 already considered to be a sufficient basis to support in part
28 the rejection of even an expert opinion.

IX. <u>Dr. Sharma's Opinion</u>

Plaintiff argues that the ALJ erred in rejecting Dr. Sharma's opinion because it was supported by the medical evidence. Further, the ALJ failed to consider and state legally sufficient reasons for not giving controlling weight to Dr. Sharma's opinion of 2006.

A. <u>Legal Standards</u>

The standards for evaluating treating source's opinions are established:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." <u>Id.</u> § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. <u>Id.</u> § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. <u>Id.</u> § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or

her familiarity with other information in the case
record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9ᵗʰ Cir. 2007).

With respect to proceedings under Title XVI, the Court notes
that an identical regulation has been promulgated. See, 20 C.F.R.
§ 416.927.

As to the legal sufficiency of the ALJ's reasoning, the
governing principles are likewise established:

> The opinions of treating doctors should be given more
> weight than the opinions of doctors who do not treat
> the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th
> Cir.1995) (as amended).] Where the treating doctor's
> opinion is not contradicted by another doctor, it may
> be rejected only for "clear and convincing" reasons
> supported by substantial evidence in the record. Id.
> (internal quotation marks omitted). Even if the
> treating doctor's opinion is contradicted by another
> doctor, the ALJ may not reject this opinion without
> providing "specific and legitimate reasons" supported
> by substantial evidence in the record. Id. at 830,
> quoting Murray v. Heckler, 722 F.2d 499, 502 (9th
> Cir.1983). This can be done by setting out a detailed
> and thorough summary of the facts and conflicting
> clinical evidence, stating his interpretation thereof,
> and making findings. Magallanes [v. Bowen, 881 F.2d
> 747, 751 (9th Cir.1989).] The ALJ must do more than
> offer his conclusions. He must set forth his own
> interpretations and explain why they, rather than the
> doctors', are correct. Embrey v. Bowen, 849 F.2d 418,
> 421-22 (9th Cir.1988).
> Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998);
> accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at
> 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9ᵗʰ Cir. 2007).

B. Analysis

After making her credibility findings, the ALJ noted the
findings and assessments of consulting examiners Dr. Tran and Dr.
Lessenger. The ALJ then assessed the record as a whole in detail,
reciting the mild findings and opinions of Plaintiff's capacities
rendered by various experts during the worker's compensation

proceedings, and noting the scant treatment records from August

2006 through March 2008 showing only routine medication

management of miscellaneous medical conditions. The ALJ concluded

that the medical evidence as a whole supported the findings of

both consulting examiners and their assessments that Plaintiff

had the physical and mental ability to perform sustained work

activities. (A.R. 21.)

The ALJ stated the following concerning Dr. Sharma:

> A neurosurgical consultation revealed that the claimant
> needed to only (sic) be treated conservatively, with
> nonsurgical treatment for pain, (sic) was found to
> have very minimal cervical findings (Exhibit 6F, pp.
> 49-51). In June 2004, the claimant's treating physical
> medicine specialist, Dr. Sharma, diagnosed the claimant
> with low back chronic pain and strain, with MRI evidence
> of degenerative disc disease, and a component of depression
> (Exhibit 10F). However, electromyographic studies were
> normal (Exhibit 10F, pp. 12 and 16) and the actual MRI
> of the claimant's lumbosacral spine revealed only
> relatively mild degenerative disc disease, most pronounced
> at the L4-L5 and L5-S1 levels (Exhibit 16F, p. 11).

> Updated records from Dr. Sharma also contain x-rays
> of the bilateral knees which are essentially normal
> (Exhibit 23F, p. 30) and ongoing medication management
> for the claimant's complaints of low back pain and
> neck pain (Exhibit 23F, pp. 25, 17 and 3). Throughout
> the clinical notes, Dr. Sharma consistently states
> that the claimant is "doing fair" (Exhibit 23F, pp.
> 26, 24, 23, 22, 15, 2 and 1), and does not state that
> the claimant is disabled until his May 2008 Medical
> Source Statement, in which he says the claimant's
> prognosis is "fair good," but still indicates that the
> claimant can "rarely" lift and carry even less than
> 10 pounds, sit, stand and/or walk less than 2 hours in
> an 8-hour workday, move her head in any direction, and
> rarely stoop, crouch, kneel, crawl, climb and balance,
> and will miss work more than 4 days a month because
> of her symptoms (Exhibit 25F). Clearly, Dr. Sharma is
> basing his opinion that the claimant has significant
> impairment (sic) based upon her subjective complaints,
> and not on the objective evidence of record.

(A.R. 21-22.) The ALJ then noted the opinions of the state agency

physicians from 2005 that Plaintiff could essentially perform

medium work with postural and manipulative limitations. (A.R. 22.)

The ALJ thus relied on the inconsistency of the medical record with Dr. Sharma's opinion, including the mild objective findings throughout the record, conservative treatment by medication from multiple medical sources, the opinion of a specialist (neurosurgeon Bhatti in 2001) as to the lack of need for treatment other than conservative measures, and the internal inconsistency of Dr. Sharma's own prognosis of "fair good" and notations concerning Plaintiff's "doing fair" with Dr. Sharma's opinion of Plaintiff's limited RFC and disability. The ALJ also relied on Dr. Sharma's apparent reliance on Plaintiff's subjective complaints and not on the objective evidence of record.

Reliance on the lack of supporting findings was appropriate. The more consistent an opinion is with the record as a whole, the more weight will be given to the opinion. 20 C.F.R. §§ 404.1527(d)(4), 416.927(d). A conclusional opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). It is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).

The fact that an opinion is based primarily on the patient's subjective complaints may be properly considered. Matney on

Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where a treating source's opinion is based largely on the Plaintiff's own subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the treating source's opinion. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

Here, as the foregoing summary of evidence and discussion demonstrate, the ALJ reasonably concluded with the support of substantial evidence that Dr. Sharma's opinion of disability was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was not consistent with the other substantial evidence in the record, including Dr. Sharma's own treatment notes. The record likewise supports the ALJ's conclusion that in forming his opinion, Dr. Sharma necessarily relied on Plaintiff's subjective complaints, as distinct from the medical evidence of record, which was notably inconsistent with Dr. Sharma's assessment of Plaintiff's functionality. The ALJ's reasoning was specific and legitimate.

Plaintiff argues that the ALJ failed expressly to address Dr. Sharma's 2006 opinion, and the ALJ erroneously concluded that the doctor did not opine that Plaintiff was disabled until 2008.

Dr. Sharma opined in 2006 that Plaintiff could perform low-stress jobs, but in 2008, he expressly opined that Plaintiff was incapable of even low-stress jobs because of her neck and back pain. Although the functional limitations assessed by Dr. Sharma in his 2006 opinion might have, if augmented by vocational evidence, resulted in a conclusion of disability, the expert's opinion was not that Plaintiff was per se disabled. Thus, the ALJ

1  correctly observed that Dr. Sharma did not state that Plaintiff
2  was disabled until the May 2008 medical source statement.

3      With respect to the ALJ's failure expressly to address Dr.
4  Sharma's opinion of 2006, the Court is mindful that a fundamental
5  principle of review operative in this case is that this Court is
6  limited to reviewing the findings of the ALJ and to reviewing the
7  specific facts and reasons that the ALJ asserts. Connett v.
8  Barnhart, 340 F.3d 871, 874 (9th Cir. 2003). An ALJ need not
9  discuss evidence that is neither significant nor probative.
10 Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003). However,
11 with respect to significant, probative evidence, such as an
12 expert opinion, an ALJ must explicitly reject the opinion and set
13 forth specific reasons of the requisite force for doing so.
14 Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996). The
15 district court cannot make findings for the ALJ. Id. A district
16 court cannot affirm the judgment of an agency on a ground the
17 agency did not invoke in making its decision. Pinto v. Massanari,
18 249 F.3d 840, 847-48 (9th Cir. 2001). The authorities thus reflect
19 the basic principle that the ALJ's opinion must contain
20 sufficient findings to permit intelligent judicial review,
21 particularly with respect to significant probative evidence.
22 Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984).

23     Here, the ALJ's decision included a detailed summary of the
24 longitudinal course of Dr. Sharma's assessments and treatment of
25 Plaintiff. (A.R. 20-22.) The Appeals Council had directed the ALJ
26 to evaluate Exhibit 19F, which included the 2006 opinion of Dr.
27 Sharma that Plaintiff was restricted to a very limited range of
28 sedentary work and required a cane. (A.R. 127-28.) However, when

directing the ALJ to consider the treating source opinions and explain the weight given to such evidence, the Appeals Council stated:

> As appropriate, the Administrative Law Judge may request the treating source to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments (20 CFR 404.1512 and 416.912). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.

(A.R. 127-28.)

The ALJ's description of the development of Dr. Sharma's treatment of Plaintiff as well as the ALJ's reference to the Appeals Council's direction to the ALJ to consider the treating source opinions pursuant to the regulations (A.R. 16) are consistent with a conclusion that the ALJ was aware of Dr. Sharma's opinion of 2006. Further, it is clear that upon remand, additional treatment history and an updated opinion concerning Plaintiff's RFC were obtained from Dr. Sharma. Finally, reference to Dr. Sharma's two opinions shows that the differences between them were generally slight: Plaintiff's capacity to carry ten pounds occasionally and twenty to fifty rarely had deteriorated to carrying only rarely up to ten pounds; Plaintiff's manipulative limitations had disappeared; Plaintiff's ability to concentrate and attend had deteriorated from a maximum of fifteen minutes to ten minutes, her ability to walk had increased from one to two blocks, the frequency of her needed five-minute breaks for walking around increased from every half hour to every fifteen minutes, and the length of the hourly breaks she needed had increased from five to ten minutes. The only other change was

1  that Plaintiff's ability to tolerate low-stress jobs had been
2  replaced by an incapacity to tolerate even low-stress jobs due to
3  neck and back pain.

4      The ALJ's treatment of the reasons for not giving Dr.
5  Sharma's assessments controlling weight was not specific to
6  either opinion. The Court notes that although Plaintiff claimed
7  an escalating and debilitating array of subjective complaints,
8  the objective medical evidence and mild signs upon which the ALJ
9  relied remained essentially constant; this is not a case of a
10 dramatic worsening of objective signs over time or of any marked
11 progression of a seriously degenerative process. The reasons why
12 the ALJ rejected Dr. Sharma's assessments and judgment of 2008
13 did not differ, and would not have differed, from the reasons for
14 rejecting his judgment of 2006. The reasons related to the
15 inconsistency of the opinion with the general weight of the
16 evidence; the absence of objective medical evidence, such as
17 clinical findings, to support Plaintiff's exaggerated subjective
18 complaints; and to Dr. Sharma's apparent reliance on Plaintiff's
19 exaggerated reports, which the ALJ had determined were not worthy
20 of credence. A reading of the entirety of the ALJ's decision
21 leads to a conclusion that the ALJ failed to give controlling
22 weight to Dr. Sharma's opinions because they were inconsistent
23 with and unsupported by the objective medical evidence of record,
24 were inconsistent with Dr. Sharma's own treatment notes, and were
25 based on Plaintiff's subjective complaints.

26     In summary, the Court concludes that the ALJ did not fail to
27 state specific and legitimate reasons, supported by substantial
28 evidence, for his weighing of Dr. Sharma's opinions.

X. Disposition

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Sheila Lambert.


IT IS SO ORDERED.

**Dated:    April 1, 2010**                  /s/ Sandra M. Snyder
                                      UNITED STATES MAGISTRATE JUDGE